IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FILED
AUG 28 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

KEVIN MEREDITH LUCAS,                )
                                      )
          Petitioner,                 )
                                      )
v.                                    )        Civil Action No. 3:16CV891–HEH
                                      )
HAROLD CLARKE,                        )
                                      )
          Respondent.                 )

## MEMORANDUM OPINION
### (Granting Motion to Dismiss and Denying 28 U.S.C. § 2254 Petition)

Kevin Meredith Lucas, a Virginia inmate proceeding with counsel, brings this

petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1). In his § 2254

Petition, Lucas asserts that he received ineffective assistance of counsel at trial, which

resulted in his conviction for second-degree murder and felony child neglect.

Specifically, Lucas contends that his counsel was ineffective when he unreasonably

agreed, or failed to object to, the instructions on felony homicide, involuntary

manslaughter, malice, and felony child neglect. (§ 2254 Pet. 9–20.) Respondent moves

to dismiss. Lucas has responded to Respondent's motion. For the reasons that follow,

the Motion to Dismiss (ECF No. 5) will be granted and the § 2254 Petition (ECF No. 1)

will be denied.

### I. Procedural History

On September 13, 2010, a grand jury convened in Henrico County, Virginia,

charged Lucas with first-degree murder and felony child neglect. Indictment,

*Commonwealth v. Lucas*, Nos. CR10–3253–F, CR10–3154–F (Va. Cir. Ct. Sept. 13, 2010). At the conclusion of the Commonwealth's evidence at trial, the Henrico County Circuit Court ("Circuit Court") sustained Lucas's motion to strike and reduced the first-degree murder charge to a charge of second-degree murder. (Jan. 26, 2011 Tr. 469.) Lucas was then convicted of second-degree murder and felony child neglect on January 27, 2011. (Jan. 27, 2011 Tr. 555.) On March 30, 2011, the Circuit Court heard arguments on Lucas's Motion to Set Aside the Verdict. (Mar. 30, 2011 Tr. 612.) The Circuit Court overruled Lucas's motion, confirmed his conviction, and imposed the jury sentence of 50 years of imprisonment, 40 years for his conviction of second degree murder and 10 years for his conviction of felony child neglect. (Mar. 30, 2011 Tr. 619–20.) Lucas appealed.

## A. Direct Appeal

On appeal, Lucas challenged, *inter alia*, the felony homicide, involuntary manslaughter, malice, and child neglect jury instructions submitted at his trial. Petition for Appeal 9–23, *Lucas v. Commonwealth*, No. 0805–11–2 (Va. Ct. App. filed Aug. 23, 2011). On January 6, 2012, a single judge of the Court of Appeals of Virginia refused Lucas's petition for appeal. *Lucas v. Commonwealth*, No. 0805–11–2 (Va. Ct. App. Jan. 6, 2012.) On March 9, 2012, a panel of the Court of Appeals of Virginia granted Lucas an appeal on his assignment of error challenging his jury instructions. *Lucas v. Commonwealth*, No. 0805–11–2 (Va. Ct. App. Mar. 9, 2012). After both briefing and oral argument, the Court of Appeals affirmed Lucas's convictions by an unpublished opinion dated December 18, 2012. *Lucas v. Commonwealth*, No. 0805–11–2 (Va. Ct.

App. Dec. 18, 2012). The Supreme Court of Virginia refused Lucas's petition for appeal

on April 24, 2013. *Lucas v. Commonwealth*, No. 0805–11–2 (Va. Apr. 24, 2013).

## B. State Habeas

On January 27, 2014, Lucas filed a petition for a writ of habeas corpus with the

Circuit Court wherein he claimed that his trial counsel rendered ineffective assistance by:

| Claim A: | Counsel's failure to object to the jury instruction on felony homicide; |
|---|---|
| Claim B: | Counsel's failure to object to the jury instruction on involuntary manslaughter; |
| Claim C: | Counsel's failure to object to the instruction on inferring malice; |
| Claim D: | Counsel's failure to object to the jury instruction on child neglect; and, |
| Claim E: | Counsel's failure to request a jury instruction defining the term "willful" as used in the child neglect instruction. |

Petition for Writ of Habeas Corpus 8–18, *Lucas v. Manis*, No. CL14–191 (Va. Cir. Ct.

filed Jan. 27, 2014).

After oral arguments, a Final Order was entered on August 17, 2015, wherein the

Circuit Court found that the strength of the evidence prevented Lucas from proving that

but for counsel's errors, a reasonable probability existed of a different trial result as

required under the prejudice prong of *Strickland v. Washington. Lucas v. Manis*,

No. CL14–191, at 1 (Va. Cir. Ct. Aug. 17, 2015). Lucas appealed the Circuit Court's

habeas decision to the Supreme Court of Virginia, which refused his petition for appeal

on May 12, 2016.[1] *Lucas v. Manis*, No. 151749 (Va. May 12, 2016). The parties agree that Lucas has sufficiently exhausted his state court remedies and that his § 2254 Petition is timely, making the action ripe for this Court's review.

## II. Summary of the Evidence Presented at Trial

At trial, the Commonwealth produced compelling circumstantial evidence of Lucas's guilt. For background, the Commonwealth's evidence showed that in early April 2010, Maria Stephens was employed as a mortgage underwriter in Richmond, Virginia, and had three sons: eight year-old E.S., five year-old A.S., and three year-old C.S.[2] (Jan. 25, 2011 Tr. 105–06.) In the weeks leading up to April 15, 2010, C.S. was in good physical health aside from his asthma and an apparent injury on his head that was healing.[3] (Jan. 25, 2011 Tr. 114–15; Jan. 26, 2011 Tr. 332–33.) The remainder of the Commonwealth's evidence focused on the events of April 15, 2010, and on the observations of medical and lay witnesses regarding C.S. on the day in question.

### A. April 15, 2010

On April 15, 2010, Maria Stephens took E.S. to school and went to work, leaving

---

[1] The Supreme Court of Virginia refused Lucas's state habeas appeal in a two-sentence order where it found "no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal." *Lucas v. Manis*, No. 151749, at 1 (Va. May 12, 2016). This denial constitutes an adjudication on the merits, and the parties have not addressed a contrary characterization. *See Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (en banc); *Renoir v. Virginia*, No. 7:99cv580, 2001 WL 34801301, at *8 n. 7 (W.D. Va. July 31, 2001) (holding that the Virginia Supreme Court adjudicated a claim on the merits where it found "no reversible error in the judgment complained of").

[2] The Court uses the children's initials because they are minors.

[3] The trial transcript reads "[C.S.] . . . had a (unintelligible) on his head, and that had been healing. But that was the only, you know, injury that, you know, I could, you know, physically see that was on him, you know." (Jan. 25, 2011 Tr. 115.)

Lucas, Ms. Stephens's occasional live-in boyfriend, as the sole daytime caretaker of A.S. and C.S. (Jan. 25, 2011 Tr. 112–13, 115–16.) Around 1:30 p.m., Ms. Stephens received a phone call from Lucas saying that C.S. had hit his head after running out of the bathroom and had eaten lunch and thrown up, but that he was okay. (Jan. 25, 2011 Tr. 117–18.) When E.S. arrived home from school that afternoon, Lucas told him not to go into C.S.'s room or wake him up. (Jan. 26, 2011 Tr. 344.) E.S. did "peep[]" in on C.S. through his bedroom door and saw C.S. in bed, but he did not hear C.S. speak or see C.S. leave the room. (Jan. 26, 2011 Tr. 345.)

Ms. Stephens arrived home from work shortly after 5:00 p.m. and saw E.S. and A.S. playing outside. (Jan. 25, 2011 Tr. 118–19.) She asked Lucas about C.S. and he answered that C.S. was upstairs because he wanted to take a nap. (Jan. 25, 2011 Tr. 119.) Lucas acted unusual by telling her she was "the best girlfriend [he] ever had" and indicated that he wanted to have sex with her. (Jan. 25, 2011 Tr. 119–20.) Ms. Stephens replied that she did not have time because she had to take A.S. to baseball practice. (Jan. 25, 2011 Tr. 120.) Ms. Stephens noticed A.S.'s baseball uniform lying on the end table in the living room and testified that it was unusual that A.S. changed into his uniform in the living room, rather than in the bedroom he shared with C.S. (Jan. 25, 2011 Tr. 120–21.)

Ms. Stephens went upstairs to change out of her work clothes with Lucas following "right behind [her]." (Jan. 25, 2011 Tr. 121.) Ms. Stephens went briefly into C.S.'s room and, seeing that the covers were pulled over his body, thought that he was sleeping. (Jan. 25, 2011 Tr. 121, 157–58.) Ms. Stephens believed she saw mucus

5

coming out of C.S.'s nose, so she retrieved a tissue and wiped his nose with it. (Jan. 25, 2011 Tr. 121–22.) Lucas took the used tissue from her and asked her if she could hear C.S. snoring. (Jan. 25, 2011 Tr. 122.) Ms. Stephens thought this was "very unusual" because Lucas knew she was hearing impaired and would not have been able to hear C.S. snoring. (Jan. 25, 2011 Tr. 122.) After roughly 20–35 seconds in C.S.'s room, Ms. Stephens "bent down and gave . . . [C.S.] a peck on the cheek" and then left for baseball practice with A.S. and E.S. around 6:15 p.m. (Jan. 25, 2011 Tr. 122, 124–25.)

On her way, Ms. Stephens received a call from Lucas telling her C.S. was not breathing. (Jan. 25, 2011 Tr. 126.) Ms. Stephens called 911 and reported that she believed C.S. was having an asthma attack. (Jan. 25, 2011 Tr. 126.) Paramedics arrived on the scene at 6:34 p.m. (Jan. 25, 2011 Tr. 82.) Emergency Medical Technicians (EMTs) found Lucas home alone with C.S. (Jan. 25, 2011 Tr. 83.) C.S.'s body was lying on the living room floor. (Jan. 25, 2011 Tr. 84.) Robert Arnold, the responding EMT, determined that C.S. was beyond resuscitation. (Jan. 25, 2011 Tr. 85–86.) Arnold observed a large bump and laceration on C.S.'s head, bruises on his neck, chest, back, buttocks, and leg, and that his eyes were black. (Jan. 25, 2011 Tr. 84, 87–89.) C.S. was pronounced dead at 6:37 p.m. (Jan. 25, 2011 Tr. 91.) Although Ms. Stephens reacted hysterically to C.S.'s death, Lucas remained "very distant, not upset . . . or hysterical." (Jan. 25, 2011 Tr. 102.)

At the scene, Lucas told the EMTs that C.S. was breathing twenty minutes before their arrival and that, although C.S. had hit his head and thrown up around 2:00 p.m., Lucas "cleaned him up real good" and C.S. rode his bicycle. (Jan. 25, 2011 Tr. 170.)

Lucas was overheard telling Ms. Stephens multiple times to "remember [she] kissed him, he was fine" earlier in the day. (Jan. 25, 2011 Tr. 210.) Lucas spoke with detectives at the police station later that night where he denied having seen the majority of the injuries to C.S.'s body. (Jan. 25, 2011 Tr. 235–46.) Lucas provided a written statement to the police stating that C.S. hit his head on the corner of a wall around 1:00 p.m., that Lucas had cared for him with ice, Neosporin, and a cold rag, that later C.S. played outside for about 30 minutes and watched TV, and that C.S. laid down around 2:45 p.m. (Jan. 25, 2011 Tr. 171–72.) Lucas also stated that when he checked on C.S. after Ms. Stephens left that evening, C.S. was still alive and "looked at [him]," but then became nonresponsive so he attempted CPR. (Jan. 25, 2011 Tr. 172.)

## B. Additional Trial Testimony

At trial, the Commonwealth produced two medical experts to explain the severity of the injuries to C.S.'s body and several lay witnesses to rebut Lucas's story that C.S. hit his head and then rode his bicycle on the day of his death. Additional testimony about C.S.'s clothing, the scene of the crime, Lucas's behavior on the day in question, and Lucas's attitude towards C.S. was offered as further evidence of his guilt.

Dr. Kevin Whaley testified that he performed the autopsy on C.S.'s body. (Jan. 25, 2011 Tr. 264–65.) The autopsy revealed that C.S. had eleven severe contusions affecting his face and scalp, as well as additional trauma to his eyes, abdomen, chest, back, buttocks, arm, legs, and genitalia, including hemorrhaging in his brain, stomach, pancreas, and colon. (Jan. 25, 2011 Tr. 266–98.) Dr. Whaley explained that some of the bruises to C.S.'s body were "fingertip contusions," signifying that someone had

7

forcefully grabbed him. (Jan. 25, 2011 Tr. 295.) Even more telling, the injuries to C.S.'s genitals indicated that the area had been pinched and grabbed, which Dr. Whaley opined is consistent with a "caretaker [who] gets angry because the kids wet their pants." (Jan. 25, 2011 Tr. 297–98.)

Dr. Whaley explained that, based on the paramedics' description of C.S.'s cold body at the scene and the fact that any blankets covering C.S. would slow his body cooling, it had taken hours for C.S.'s external temperature to fall below the average of 98.6 when it was recorded as 74 degrees at 11:00 p.m. (Jan. 25, 2011 Tr. 284–87.) Significantly, the autopsy revealed that the injuries to C.S.'s head were 360 degrees, demonstrating that "something . . . struck [C.S.'s] head multiple times around the head." (Jan. 25, 2011 Tr. 267–68.) Dr. Whaley further explained that it is common for such extensive head trauma to cause vomiting. (Jan. 25, 2011 Tr. 305.) Ultimately, Dr. Whaley concluded that C.S.'s injuries had occurred within 10 hours of the paramedics' arrival, (Jan. 25, 2011 Tr. 300–01), that he had died of blunt force trauma to the head, (Jan. 25, 2011 Tr. 275), and that the extensive injuries to his body could not have been the result of force by another child, (Jan. 25, 2011 Tr. 289, 292), attempted CPR, (Jan. 25, 2011 Tr. 283–84, 290), or C.S. having run into a wall. (Jan. 25, 2011 Tr. 301–02.)

Further, Dr. Whaley and Dr. Robin Foster, Division Chairman of Pediatric Emergency Services at Virginia Commonwealth University Health Systems, testified that once C.S. suffered the head trauma described above, he would not have been able to subsequently talk, eat, watch TV, or ride his bicycle given its severity. (Jan. 25, 2011 Tr. 304–05; Jan. 26, 2011 Tr. 352, 364.) Dr. Foster also opined that the injuries to C.S.'s

genitals were a "pattern of injury [that] is seen in toddler-aged children . . . who are potty training or who may not be continent of their urine all the time, and in response to a toilet training accident, that area will get pinched by the caretaker." (Jan. 26, 2011 Tr. 357.) Dr. Foster further explained that the bruising on both sides of C.S.'s ears indicated an "inflicted injury in the form of the ear being grabbed and pulled." (Jan. 26, 2011 Tr. 357.)

The Commonwealth also put on testimony from the Stephenses' neighbors and C.S.'s brothers, E.S. and A.S., to further refute Lucas's story and establish his guilt. The Stephens' neighbor, William Shoaf, testified that as a frequent smoker, he would often see C.S. and his brothers riding their bicycles outside when he was out on his smoke breaks. (Jan. 26, 2011 Tr. 333.) On April 15, 2010, however, Shoaf never saw C.S.; he did see Lucas around 3:00 p.m. acting "pretty, pretty irate, pretty mad, pretty upset." (Jan. 26, 2011 Tr. 334–36.) Another neighbor, Sandra Hardney, testified that the three times she saw Lucas that day he was dressed in different clothing. (Jan. 25, 2011 Tr. 218–19.) E.S. testified that Lucas would get mad at C.S. for "pee[ing] on the sofa" and that C.S. would respond to Lucas's anger by "crying and pee[ing] on himself." (Jan. 26, 2011 Tr. 342–43.) A.S. testified that on April 15, 2010, C.S. "pooped in the bathtub" and that Lucas spanked him for it. (Jan. 26, 2011 Tr. 386–87.) A.S. further testified that Lucas got mad that day and that he saw Lucas throw C.S. on the ground, after which Lucas "picked [C.S.] up and put him in his bed," which was the last time A.S. saw or heard from C.S. (Jan. 26, 2011 Tr. 381–82.)

9

The responding paramedics and investigators testified about C.S.'s clothing and the scene of the crime. EMT Arnold and Investigator Doug Hedrick testified that C.S. was not wearing underwear and that his pants smelled of urine. (Jan. 25, 2011 Tr. 88, 180.) Hedrick added that a pair of children's underwear and a pair of small blue pants were found in the washer and smelled of urine. (Jan. 25, 2011 Tr. 187.) Hedrick also testified that C.S.'s bed was missing its fitted sheet and that a fitted twin-sized sheet and Spider-Man blanket were located in the dryer of the apartment. (Jan. 26, 2011 Tr. 184–85, 197.) Additional testimony from Hedrick suggested that alcohol was consumed at the scene and that the living room floor "smelled of cleaner [and] had vomit . . . on it." (Jan. 25, 2011 Tr. 187–88.) Finally, the jury heard a recorded 911 call placed on April 5, 2010, in which C.S. can be heard saying, "I'm going to tell Mommy," and Lucas responds saying, "I'm going to wear your ass out" and "[i]f you cry again, I'm going to whip your little ass." (Jan. 25, 2011 Tr. 134–35.)

After hearing all of the evidence, the jury found that the Commonwealth's evidence disproved Lucas's version of events and established beyond a reasonable doubt that he was the cause of C.S.'s death. Accordingly, Lucas was convicted of second-degree murder and felony child neglect.

### III. Standard of Review

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 limits this Court's authority to grant relief by way of a writ of habeas corpus.

10

Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

## IV. Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component

11

requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

## V. Analysis of Lucas's Claims

At trial, the Commonwealth's attorneys and Lucas's counsel agreed to a total of ten jury instructions, including a single "cascading homicide instruction" that listed the greatest charge of second-degree murder and the lesser included offenses of felony homicide and involuntary manslaughter. Sheldon Aff. 2;[4] *see* Jury Instructions, *Commonwealth v. Lucas*, No. CR10-3154-F (Va. Cir. Ct. Jan. 26, 2011). The "cascading homicide instruction" was submitted as Jury Instruction No. 3. Sheldon Aff. 2; Jury Instruction No. 3, *Commonwealth v. Lucas*, No. CR10-3154-F (Va. Cir. Ct. Jan. 26, 2011).

It is helpful to clarify that in the present action, Lucas does not challenge the jury instruction on second-degree murder—the crime for which he was actually convicted. Rather, Lucas contends that the instructions on the lesser included offenses of felony homicide and involuntary manslaughter were flawed. Lucas also questions the jury

---

[4] The record includes an affidavit from Lucas's trial counsel, Gregory Sheldon, explaining his trial strategy in accepting the charged jury instructions. Motion to Dismiss, Ex. 1, *Lucas v. Manis*, No. CL14-191 (Va. Cir. Ct. filed Mar. 28, 2014). Where appropriate, the Court will cite to Mr. Sheldon's Affidavit as "Sheldon Aff."

12

instruction on child neglect—of which he was convicted—and the instruction on malice.

As to all these claims, the Circuit Court found on state habeas review that the strength of

the evidence foreclosed Lucas from proving that but for counsel's errors, a reasonable

probability existed of a different trial result, as required under the prejudice prong of

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Lucas v. Manis*, No. CL14–191, at

1 (Va. Cir. Ct. Aug. 17, 2015). This Court will analyze Lucas's claims as they are

presented in his § 2254 Petition.

## A. Ineffective assistance of counsel with respect to the felony homicide instruction

In his first claim, Lucas contends that trial counsel was ineffective for

unreasonably agreeing to, or failing to object to, the felony homicide instruction because

it "negated the element of malice, omitted the element of causal connection, and

misstated another element by referencing child neglect (which, on its own, was

incorrect)." (§ 2254 Pet. 9.)[5]

At trial, Instruction No. 3 stated, in relevant part:

> If you find that the Commonwealth has failed to prove
> beyond a reasonable doubt that the killing was malicious but that the
> Commonwealth has proved beyond a reasonable doubt that the
> defendant killed [C.S.] and further:
>
> 1. That the killing was accidental and contrary to the intention
>    of the defendant; and
>
> 2. That the defendant was then committing a felony, to wit:
>    felony child neglect.
>
> Then you shall find the defendant guilty of felony homicide . . . .

---

[5] The Court omits the emphasis in quotations from Lucas's submissions.

Jury Instruction No. 3, *Commonwealth v. Lucas*, No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011).

At the time of Lucas's trial, felony homicide was defined under Virginia law as "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act." Va. Code Ann. § 18.2–33 (West 2011).

Lucas first claims that the instruction on felony homicide "negated" the element of malice. However, malice is not a required element of felony homicide under Virginia law.[6] Rather, malice is imputed from the underlying felony. *See Hickman v. Commonwealth*, 398 S.E.2d 698, 699–700 (Va. Ct. App. 1990) (finding jury instruction on felony homicide sufficient where no element required a finding of malice). Lucas's trial counsel correctly recognized that a separate finding of malice is not required for a conviction of felony homicide. *See* Sheldon Aff. 3. Thus, he was not constitutionally deficient in his performance for failing to object to a correct statement of Virginia law. *See Rueda v. Clarke*, No. 1:14CV699 LMB/IDD, 2015 WL 1236226, at *18 (E.D. Va. Mar. 17, 2015) (citation omitted), *appeal dismissed*, 607 F. App'x 306 (4th Cir.), *cert. denied*, 136 S. Ct. 427 (2015).

Second, Lucas argues that the felony homicide instruction "omitted the element of causal connection, and misstated another element by referencing child neglect." (§ 2254

---

[6] The Virginia Model Jury Instruction on felony homicide likewise does not include an element of malice. *See* Va. Model Jury Instruction No. G33.340.

Pet. 9.) In support of his argument, Lucas references several Virginia cases[7] and Virginia

Model Jury Instruction G33.340 for the proposition that the instruction on felony

homicide given at Lucas's trial failed to require a finding of a causal connection between

Lucas's actions and C.S.'s death. (*See id.* at 10–12.) While none of the cases cited by

Lucas directly supports the proposition that this jury instruction negated the required

causal element necessary for a finding of felony homicide, Virginia Model Jury

Instruction No. G33.340 does contain two references to causation, namely: "[t]hat the

killing was caused by acts performed in the commission of (name of felony); and [t]hat

the killing and (name of felony) were parts of one continuous transaction and were

closely related in time and place." Va. Model Jury Instruction G33.340 (emphasis

omitted).[8] Thus, Lucas argues, "[i]n place of these two elements, the jury was instructed

---

[7] Specifically, Lucas cites: *Heacock v. Commonwealth*, 323 S.E.2d 90 (Va. 1984); *Davis v. Commonwealth*, 404 S.E.2d 377 (Va. Ct. App. 1991); *King v. Commonwealth*, 368 S.E.2d 704 (Va. Ct. App. 1988); *Barrett v. Commonwealth*, 530 S.E.2d 437 (Va. Ct. App. 2000); *Doane v. Commonwealth*, 237 S.E.2d 797 (Va. 1977); *Griffin v. Commonwealth*, 533 S.E.2d 653 (Va. Ct. App. 2000).

[8] The Virginia Model Jury Instruction for second-degree felony homicide states:

The defendant is charged with the crime of felony homicide. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:

(1) That the defendant killed (name of person); and

(2) That the killing was accidental and contrary to the intention of the defendant;

(3) That the killing was caused by acts performed in the commission of (name of felony); and

15

that they need only find that 'the defendant was then committing a felony,' requiring no causal connection between the death and the felony." (§ 2254 Pet. 12.) Lucas misconstrues the operative language of the instruction.

The instruction required more than simply a finding that Lucas was committing just any felony. Specifically, the jury could only have found Lucas guilty of felony homicide if they found, *inter alia*, that Lucas "killed [C.S.]" and that he "was then committing a felony, to wit: felony child neglect." Jury Instruction No. 3, *Commonwealth v. Lucas*, No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011). In other words, the lethal act must have occurred *during the course* of the commission of felonious child neglect. Further, under Virginia law, "then committing" is a sufficient causal connection to support a felony homicide conviction.[9] *See Hickman*, 398 S.E.2d at 700 n.1 (finding jury instruction on felony homicide sufficient where jury was required to find defendant "was then committing the felonies of . . ."), *aff'd*, 410 S.E.2d 88 (Va. 1991); *accord Talbert v. Commonwealth*, 436 S.E.2d 286, 290 (Va. Ct. App. 1993) (finding jury instruction on felony homicide insufficient where it required a finding that the defendant "had committed" the felony). Moreover, "[e]ven if [a] jury instruction issued was not

> (4) That the killing and (name of felony) were parts of one
>     continuous transaction and were closely related in time and
>     place.
>
> If you find from the evidence that the Commonwealth has proved beyond a
> reasonable doubt each of the above elements of the crime as charged, then you
> shall find the defendant guilty . . . .

Va. Model Jury Instruction No. G33.340 (emphasis omitted).

[9] The construction Lucas complains of was even incorporated in a past Virginia Model Jury Instruction. *See Ellison*, 2001 WL 34062434, at *3.

part and parcel identical to the model jury instruction, federal habeas courts cannot grant relief simply because the instruction is slightly deficient." *Ellison v. Angelone*, No. CIV. A. 01–751–AM, 2001 WL 34062434, at *4 (E.D. Va. Nov. 8, 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

Ultimately, Lucas's claim of ineffective assistance of counsel with respect to the jury instruction on felony homicide fails. The language at issue has been upheld by Virginia courts as an adequate explanation of the causal element; therefore, counsel cannot be said to be constitutionally deficient for acceding to the felony homicide instruction. *See Rueda* 2015 WL 1236226, at *18. Perhaps more importantly, Lucas was not prejudiced by the felony homicide instruction because he was not convicted of that offense. Lucas was convicted of second-degree murder, which unequivocally required a finding of malice and causation, both of which were supported by the evidence presented at trial. Obviously, Lucas suffered no prejudice because he was *not* convicted of the lesser offense of felony murder. *See Strickland*, 466 U.S. at 691 (explaining that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment"). Therefore, the Circuit Court's holding that he was not prejudiced under *Strickland* was well founded.

## B. Ineffective assistance of counsel with respect to the involuntary manslaughter instruction

In his second claim, Lucas contends that his trial counsel was ineffective for unreasonably agreeing to, or failing to object to, "[t]he involuntary manslaughter

17

instruction, which omitted the element of a causal connection between the criminal act and the death." (§ 2254 Pet. 10.) At trial, Jury Instruction No. 3 stated, in relevant part:

> If you find that the defendant did not kill [C.S.], but that [C.S.] accidently injured himself and died as a result thereof, and, that the defendant's failure to obtain medical treatment for [C.S.] was so gross, wanton, and culpable as to show a callous disregard for human life, then you shall find the defendant guilty of involuntary manslaughter . . . .

Jury Instruction No. 3, *Commonwealth v. Lucas*, No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011).

The Court need not reach the issue of whether the instruction was deficient because it finds that Lucas was not prejudiced under *Strickland*. Again, Lucas was convicted of the greater offense of second-degree murder, the instruction for which unambiguously required a finding that Lucas's actions were the sole cause of C.S.'s death. The jury rejected Lucas's defense that C.S. died of self-inflicted injuries. Rather, the jury found that the evidence proved that Lucas killed C.S. by striking him numerous times about his head. Thus, a reasonable probability does not exist that had counsel objected to the involuntary manslaughter instruction for its omittance of a causal element, Lucas would not have been convicted of second-degree murder. The Circuit Court's finding that he was not prejudiced under *Strickland* is not unreasonable.

## C. Ineffective assistance of counsel with respect to the inference of malice instruction

In his third claim, Lucas challenges "[t]he inference of malice instruction, which did not define 'unlawful killing,' contained no specific references to other instructions, did not limit the presumption to death which resulted from the Petitioner's actions, and

did not require that malice accompany the killing." (§ 2254 Pet. 10.) At trial, Jury

Instruction No. 6 stated, in relevant part:

> Once the Commonwealth has proved there was an unlawful killing, then you are entitled to infer there was malice and that the act was murder in the second degree unless, from all the evidence, you have a reasonable doubt as to whether malice existed.

Jury Instruction No. 6, *Commonwealth v. Lucas*, No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011).

Although Lucas makes a hyper-technical argument challenging what he deems

"the inference of malice instruction,"[10] his ineffective assistance of counsel claim

founders on federal habeas review. The instruction is nearly a verbatim recital of

Virginia Model Jury Instruction No. 33.300,[11] and the Supreme Court of Virginia has

held that the Commonwealth is entitled to an inference of second-degree murder

instruction. *See Thomas v. Commonwealth*, 688 S.E.2d 220, 237 (Va. 2010). Further, the

United States Court of Appeals for the Fourth Circuit has previously rejected an

ineffective assistance of counsel claim challenging the exact instruction to which Lucas

now objects. *See Hargrove v. Johnson*, No. 88–7704, 1989 WL 7284, at *1, n.1 (4th Cir.

Jan. 27, 1989). Thus, any objection by counsel to the instruction would have been

meritless, and counsel cannot be deemed ineffective for failing to raise a meritless claim.

---

[10] Virginia Model Jury Instruction No. 33.300 is entitled "Inference of Second Degree Murder" and states that in accordance with Virginia law all unlawful homicides may be inferred by the trier of fact to be murder in the second degree. *See Warlitner v. Commonwealth*, 228 S.E.2d 698, 700 (Va. 1976).

[11] Virginia Model Jury Instruction No. 33.300 states: "Once the Commonwealth has proved there was an unlawful killing, then you may infer that there was malice and that the act was murder in the second degree unless, from all the evidence, you have a reasonable doubt as to whether malice existed."

*See United States v. Moore*, 934 F. Supp. 724, 731 (E.D. Va. 1996).

### D. Ineffective assistance of counsel with respect to the combination of Claims A–C

Lucas not only challenges the jury instructions submitted at his trial individually,

but also collectively. Specifically, Lucas contends that "[a]lthough [Lucas] was

convicted of second-degree murder rather than felony homicide or involuntary

manslaughter, the flaws in the instructions for felony homicide and involuntary

manslaughter, when combined with the objectionable instruction on inference of malice

for any unlawful killing, rendered the trial unfair." (§ 2254 Pet. 17.) Lucas contends that

under all of the instructions viewed in the aggregate, a verdict of second degree murder

was "required" if the jury found any of the following:

- That [Lucas] accidently killed [C.S.] and committed child neglect, even if the child neglect had no connection to the death;

- That [C.S.] accidently killed himself and [Lucas] committed child neglect, even if the child neglect had no connection to the death;

- That [C.S.] accidently killed himself and that [Lucas] did not obtain medical treatment, even if that medical treatment would not have prevented the death.

(*Id.* at 16.)

However, as previously discussed, Lucas's arguments are meritless because the

strength of the evidence presented at trial undermines his allegation of prejudice under

*Strickland v. Washington*. Moreover, Lucas's arguments ignore Jury Instruction No. 3,

which explained that the jurors could find Lucas guilty of a lesser degree of homicide if

they believed Lucas accidently killed C.S. or that C.S. accidently killed himself and Lucas merely failed to provide appropriate medical care.

The Supreme Court has cautioned that when analyzing the prejudice component under *Strickland*, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," *Strickland*, 466 U.S. at 696, and habeas review courts "must consider the totality of the evidence before the judge or jury." *Id.* at 695. Further, "[i]n cases where a conviction has been the result of a trial, the defendant must demonstrate that but for counsel's errors, there is a reasonable probability that he would not have been convicted." *Lee v. Clarke*, 781 F.3d 114, 122–23 (4th Cir. 2015) (quoting *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010)). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

Lucas highlights the alleged flaws in the felony homicide and involuntary manslaughter instructions, but does not challenge the jury instruction on second-degree murder, the crime of which he was convicted.[12]  Lucas's habeas argument turns on the

---

[12] The instruction on second-degree murder given at Lucas's trial read:

> The defendant is charged with the crime of second degree murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1)  That the defendant killed [C.S.]; and
>
> (2)  That the killing was malicious;

speculative contention that but for counsel's acquiescence to all of the flawed instructions, the jury would have opted to convict Lucas of felony homicide or involuntary manslaughter. Lucas maintains that under the instructions actually given, the jury was required to find him guilty of second-degree murder even if Lucas "accidently" killed C.S. or if C.S. "accidently" killed himself. But this position ignores the fact that Lucas's defense throughout the trial was that C.S. died of accidental, self-inflicted injuries and that, at most, Lucas could be faulted for failing to seek timely and appropriate medical attention. *See* Sheldon Aff. 3. The jury obviously rejected this defense by making a factual finding that Lucas maliciously killed C.S. The Court similarly finds that the strength of the evidence presented at trial was such that, even if Lucas's counsel's failure to object did constitute error, the error would not have had an effect on the jury's ultimate judgment.

Therefore, this Court concludes that Lucas has failed to demonstrate a reasonable probability that any alleged errors of counsel were sufficient to undermine confidence in his second-degree murder conviction. *See Strickland,* 466 U.S. at 694; *Lee,* 781 F.3d at 122–23.[13] Accordingly, Lucas's Claims A–C will be dismissed.

---

> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty of second degree murder . . . .

Jury Instruction No. 3, *Commonwealth v. Lucas,* No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011).

[13] This case stands in stark contrast to *Lee v. Clarke,* 781 F.3d 114 (4th Cir. 2015). In *Lee,* the Fourth Circuit found that counsel's failure to request a heat of passion jury instruction amounted to ineffective assistance. *Id* at 123. The Court determined that the defendant was prejudiced by counsel's inaction because the heat of passion instruction was "crucial to Lee's

### E. Ineffective assistance of counsel with respect to the felony child neglect instruction

Finally, Lucas contends that his trial counsel was ineffective for failing to object to, or unreasonably agreeing to, the jury instruction on felony child neglect. Specifically, Lucas argues: (1) counsel was ineffective for accepting the child neglect instruction because the adjective "willful" does not appear to modify the action of "refusal to provide care for the health of C.S.;" and (2) counsel was ineffective for failing to request an additional jury instruction defining the term "willful" as used in the child neglect instruction. (§ 2254 Pet. 19.) Jury Instruction No. 7 stated, in relevant part:

> The defendant is charged with the crime of child neglect. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1) That on April 15, 2010 Kevin Lucas was responsible for the care of [C.S.]; and
>
> (2) That [C.S.] was under the age of eighteen years; and
>
> (3) That Kevin Lucas did by willful act or omission or by a refusal to provide care for the health of [C.S] cause or permit serious injury to the life or health of [C.S.].
>
> If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense

defense," and had the instruction been given, there was a reasonable probability that the jury would not have convicted the defendant of second-degree murder. *Id.* at 116, 129. However, such a situation is not presented here. In *Lee*, the evidence supported a rational finding that heat of passion, an affirmative defense against a finding of malice, was present. *Id.* at 123. In Lucas's case, his defense was that C.S. died of self-inflicted injuries, a defense that Lucas acknowledges was adequately presented in the jury instructions. Further, in *Lee*, the jury demonstrated its unease with the jury instructions and evidence presented by communicating with the trial court no less than three times during deliberations—once with a question about the jury instructions and twice to inform the Court it was deadlocked. *Id.* at 120–21. In Lucas's case, the record reflects that the jury did not communicate with the trial Court to inquire about the jury instructions or to inform the Court that it was having difficulty reaching a verdict.

charged, you shall find the defendant guilty . . . .

Jury Instruction No. 7, *Commonwealth v. Lucas*, No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011).

Pertinent to this issue, and at the time of Lucas's trial, Virginia's child abuse and neglect statute provided:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who *by willful act or omission or refusal to provide* any necessary care for the child's health causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony.

Va. Code Ann. § 18.2–371.1(A) (West 2011) (emphasis added).

Initially, Lucas maintains that trial counsel was ineffective for not objecting to the child neglect instruction because the adjective "willful" does not appear to modify the action of "refusal to provide care for the health of [C.S.]" The language complained of was taken straight from the Virginia statute, and the Virginia model jury instruction on child neglect likewise does not include "willful" immediately preceding "refusal."[14]

---

[14] The Virginia Model Jury Instruction on Child Abuse or Neglect – Serious Injury reads:

> The defendant is charged with the crime of child abuse or neglect resulting in serious injury. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1) That the defendant was a parent, guardian, or other person responsible for the care of (name of victim); and
>
> (2) That the (name of victim) was a child under the age of eighteen (18); and
>
> (3) That the defendant, by willful act, or omission, or refusal to provide any necessary care for the health of (name of victim), caused or permitted serious injury to the life or health of (name of victim).

24

Therefore, trial counsel was not deficient in agreeing to this instruction. *See Rueda*, 2015 WL 1236226, at *18.

Second, Lucas faults counsel for failing to request an additional jury instruction defining the term "willful" as used in the child neglect instruction's phrase "[t]hat Kevin Lucas did by willful act or omission or by a refusal to provide care for the health of [C.S.] cause or permit serious injury to the life or health of [C.S.]." Jury Instruction No. 7, *Commonwealth v. Lucas*, No. CR10–3154–F (Va. Cir. Ct. Jan. 26, 2011). When reviewing a claim that counsel's failure to request a jury instruction amounted to ineffective assistance, the inquiry "is twofold: (1) whether the instruction, if requested, should have been given; and (2) if the instruction had been given, was there a reasonable probability that the outcome of the proceedings would have been different." *Luck*, 611 F.3d at 189.

Virginia Model Jury Instruction No. 29.360, pertaining to child neglect cases, provides:

> A willful act is one done with a bad purpose, or without justifiable excuse, or without ground for believing it is lawful. A willful act is intentional, or knowing, or voluntary, as distinguished from accidental. The terms "bad purpose" or "without justifiable excuse" require knowledge that the particular conduct will likely result in injury or illegality.

Lucas cites to a case from the Court of Appeals of Virginia in support of his proposition that "[t]he definition of willful is required by Virginia law." (§ 2254 Pet. 19.)

---

> If you find that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty . . . .

Va. Model Jury Instruction No. G29.330.

Assuming that Lucas posits that the definition of willful is required to be included in any jury instruction on felony child neglect, the case Lucas cites, *Ellis v. Commonwealth*, 513 S.E.2d 453 (Va. Ct. App. 1999), is inapposite.[15]

However, even assuming *arguendo* that Lucas would have been entitled to a jury instruction defining "willful," there was no probability, much less a reasonable one, that Lucas would have been acquitted of child neglect on the record evidence if such an instruction had been given. According to the evidence, three year-old C.S. was killed by numerous blows to his head and injuries to nearly every part of his body while in Lucas's care. *See supra* Part II. At trial, Lucas's defense hinged on the theory that C.S. died of self-sustained injuries. *See* Sheldon Aff. 3. The jury rejected Lucas's contrived defense and found him guilty of second-degree murder. It is therefore highly likely that the jurors would have found Lucas guilty of simple child neglect, even had the definition of willful as defined in Virginia Model Jury Instruction No. 29.360 been given. Indeed, the evidence overwhelmingly supports a finding that Lucas beat C.S. to death and then sought to conceal his abuse of the child.

Therefore, because it is not reasonably likely that the outcome of the trial would have been different, counsel's performance was not deficient for failing to request a jury instruction defining the term "willful" with respect to the child neglect instruction. Lucas's Claims D–E will therefore be dismissed.

---

[15] In *Ellis*, the Virginia Court of Appeals found that the sufficiency of the evidence was inadequate to sustain a conviction for felony child neglect with the requisite "willful" intent where the defendant left her two children unattended and a fire subsequently erupted in the apartment where the children were staying. *Ellis*, 513 S.E.2d at 555. *Ellis* does not support the proposition that a jury instruction defining "willful" is required in all felony child neglect cases.

## VI. Conclusion

Viewing the record as a whole, Lucas fails to demonstrate that his trial counsel's representation fell below an objective standard of reasonableness. Lucas's perception of ineffectiveness flows from his misunderstanding of the law. Despite an array of challenges to the wisdom and judgment of his counsel, Lucas has not demonstrated that counsel's performance was inadequate, ineffective, or prejudicial. Lucas's § 2254 Petition will therefore be denied.

An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Lucas fails to meet this standard. Accordingly, a certificate of appealability will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

HENRY E. HUDSON
UNITED STATES DISTRICT JUDGE

Date: **Aug. 23, 2017**
Richmond, Virginia

27